IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>PRYA REH,<br><br>        Defendant. | Case No. 4:23-cr-0131<br><br>DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE |

    Defendant PRYA REH, pled guilty to one count of enticement and attempted enticement of a minor, an offense that took place during a dark period in his life. He now faces sentencing.

    Count One carries a mandatory minimum of ten years' imprisonment and a maximum of life. The Court must impose at least sixty months of supervised release to follow Mr. Reh's term of imprisonment. Also following his term of imprisonment, Mr. Reh will be required to register as a sex offender.

    The PSR concludes that with a total offense level 42 and criminal history category IV, the advisory guidelines recommend 360 months to life imprisonment. Mr. Reh objects to the PSR's application of a two-level enhancement under USSG § 2G2.1(b)(3). However, a determination in his favor would not change his guideline range. Accordingly, the core remaining question for resolution at sentencing is the appropriate sentence to impose based on 18 U.S.C. § 3553(a). Mr. Reh asks the Court to consider this memorandum in determining a just sentence.

**I.    EXHIBITS AND WITNESSES**

    Mr. Reh offers a letter of support as Exhibit A from his mom, and his completion of the substance abuse education course as Exhibit B for the Court's consideration at sentencing. He does not intend to call any witnesses.

## II.     ARGUMENT

### A. Mr. Reh's Offense Level and PSR Factual Objections.

Mr. Reh acknowledges the wrongs he has done that have him before this Court, which is why he pled guilty to the offense. Mr. Reh made a few PSR objections to clarify the facts in this case. Defense counsel is aware that Fed. R. Crim. P. 32(i)(3)(B) requires a district court to make specific findings as to each controverted material fact in the PSR or to determine that no such finding is necessary because the controverted fact will not be taken into account in sentencing. There are several objections to the facts that do not necessarily have to be resolved, but are not factually accurate and therefore Mr. Reh could not agree were true.

With regard to PSR ¶ 11, Mr. Reh completed the substance abuse class (*see* Ex. B) and found it so beneficial that he would like to take it again. He found the instructor very easy to understand because she explained things well and gave concrete examples that meshed with scenarios in his life. He knows this information will help him in the future.

With regard to the narrative in PSR ¶ 62, Mr. Reh was not part of the individuals who stole the vehicle. Mr. Reh did not know it was stolen when his friends came over to pick him up in the vehicle. They then wanted him to drive it as he appeared to look older than them. Additionally, in May 2020, when Mr. Reh was paroled to the ICE detainer, he was kept in custody, even after he was ordered removed on June 8, 2020. He was not released until approximately March or April 2021, when it was ultimately determined no travel documents were forthcoming.

Paragraphs 66-67: Mr. Reh objects to the narratives for other criminal conduct and dismissed conduct and asks that they not be considered at his sentencing hearing.

2

With regard to PSR ¶ 71, Mr. Reh's father was in the Karenni Army in Burma, which is why they had to flee the country and live for nine years in a refugee camp in Thailand. Additionally, Mr. Reh had a difficult transition from prison back to his parents' home. His friends had abandoned him, he did not know who his friends were, and he had a hard time meeting people. Mr. Reh's hobbies are playing soccer, fishing, and swimming.

To clarify PSR ¶¶ 74-75, Mr. Reh's father was in the hospital for the last three months. *See* Ex. A. Mr. Reh's mother's birth name is correct. When she became a U.S. citizen she changed her name to Ana Sun. *Id*. Both of Mr. Reh's parents have worked at the Tyson's plant in Perry for a number of years. With the recent news they will be losing their jobs when that plant closes in June 2024, it will be even more difficult without Mr. Reh being able to help the family.

The dates should be adjusted in PSR ¶ 102 to show that Mr. Reh worked at Wittern Group until his arrest for the instant case at work on September 18, 2023.

Mr. Reh objects to PSR ¶ 130. As there is no ICE detainer, Mr. Reh does not need to surrender to ICE at the completion of his sentence. As indicated in PSR ¶ 83, Myanmar has not issued travel documents, and therefore Mr. Reh cannot be removed until they do so, or until another country accepts him.

Mr. Reh objects to PSR ¶ 142. As a registered sex offender, it will be difficult for Mr. Reh to find housing, and needing pre-approval to stay in a hotel may render Mr. Reh homeless.

Mr. Reh objects to PSR ¶¶ 144-145. As no restitution request has been made, he objects to these supervised release conditions as unnecessary.

**B. The Distribution Enhancement Should Not Apply.**

Mr. Reh objects to the distribution enhancement in PSR ¶ 48 based on USSG § 2G2.1(b)(3). Mr. Reh agrees that he sent an image of Minor Victim #1 (MV #1) to MV #1. Because the distribution of the image was to MV #1, and not to a third party, this enhancement should not apply. The intent of the enhancement is to further punish the defendant for the harm to the victim when images of them are distributed to *others*. The guidelines in this case without the enhancement sufficiently encapsulate the conduct of Mr. Reh.

With regard to Paragraphs 53-54, 57: Mr. Reh's adjusted offense level would be 38. With the chapter four enhancement it is 43, and with acceptance of responsibility his total offense level would be 40. While this would be reflected in PSR ¶ 113, his guideline range would remain the same.

**C. A sentence well below the advisory guideline range is sufficient in light of the statutory sentencing factors.**

The Court should conclude that a sentence of imprisonment nearer to the statutory mandatory minimum of ten years' imprisonment will adequately account for the factors in 18 U.S.C. § 3553(a). Briefly stated, the factors relating to Mr. Reh's history and characteristics that support a downward variance include, but are not limited to: his unstable upbringing and his youth, his addiction, his mental health, and his acceptance of responsibility.

***Youth and Unstable Upbringing.*** Mr. Reh's offenses were serious, and he acknowledges that the nature and circumstances are aggravating. But his history and characteristics present mitigating factors supporting a downward variance in this case.

Mr. Reh was born into strife in a refugee camp in Thailand. His parents fled Burma/Myanmar due to the civil war against the Karenni people. Karenni is a sliver of land on

the southeastern side of present-day Myanmar that was the independent land of twelve subgroups of indigenous people who lived off the land as hill tribe farmers.[1] Mr. Reh and his family are Karenni (Kayah). Traditionally, Karenni people are not allowed to marry outside of their society.[2] Karenni had been independent through the British occupation of Burma, but following World War II and Burma's independence, the Karenni land was incorporated into the Burmese border, and they have faced a constant war for survival since that time.[3] Mr. Reh's father was in the Karenni army and fought for his ancestral land. It is estimated that a third of the Karenni/Kayah population fled and 2,500 villages were destroyed by the Burmese military.[4] It was from this war zone that his parents escaped to Thailand and lived the next nine years in a squalid refugee camp before finally making their way to the United States.

     Even though Mr. Reh was born in Thailand, he is still considered a citizen of Burma/Myanmar. Toil, strife, and uncertainty defined Mr. Reh's formative years. It was in that refugee camp that Mr. Reh became an alcoholic at the age of six. His addiction to alcohol while his brain was still forming appears to have had lasting effects (further discussed below). Karenni is a spoken and not written language. Mr. Reh had no proper schooling until he came to the United States. Unable to read or write in any language, school was very difficult for him. He was bullied. He was further demoralized by being an older child and placed in classes with younger children. He was also placed into special needs classes where they played games instead

---

[1] *Who are the Karenni?* https://likewedontexist.com/aboutthekarenni
[2] Karenni Social Development Center, https://sdcthailand.wordpress.com/2015/06/28/about-our-traditional-karenni-beliefs/
[3] *Who are the Karenni?* https://likewedontexist.com/aboutthekarenni
[4] *Karenni in Myanmar*, https://minorityrights.org/communities/karenni/

of trying to teach him. To this day he struggles with reading but works every day to improve his understanding.

Mr. Reh's age is mitigating and underscores his immaturity in committing this offense. Mr. Reh is now 24 years old, and he committed this offense in 2022, when he was 23 years old. He is an "emerging adult," which is a person who has reached 18 years old but is not older than 25. Melissa S. Caulum, *Postadolescent Brain Development: A Disconnect Between Neuroscience, Emerging Adults, and the Corrections System*, 2007 Wis. L. Rev. 729, 731. During emerging adulthood, the brain is still developing, "particularly in the areas of judgment, reasoning, and impulse control." *Id.* Thus, as is true of juveniles, offenders who are 25 years old or younger "can similarly have lessened moral culpability and blameworthiness as a result of their youth and immaturity." Kelsey B. Shust, Comment, *Extending Sentencing Mitigation for Deserving Young Adults*, 104 J. Crim. L. & Criminology 667, 693 (2014).

***Addiction.*** Mr. Reh became an alcoholic in the refugee camp when he was only six years old. PSR ¶ 88. He drank not for the pleasure of it, but so he could go to sleep and stay warm. *Id.* This was not uncommon for children and became part of the culture in these refugee camps.[5] Drinking at such a young age and for so long has negative effects on the brain. A recent study of the effect of alcohol on adolescents (ages 10-19) finds that to be true.[6] "The brain undergoes significant neurodevelopment during adolescence, with maturation continuing until around age

---

[5] Kaela Glass, *Understanding Alcohol Use in the Karen Community* (Center for Urban and Regional Affairs, University of Minnesota 2011), https://conservancy.umn.edu/bitstream/handle/11299/195656/CMV-032.pdf?sequence=1&isAllowed=y

[6] Briana Lees, et al., *Effect of Alcohol Use on the Adolescent Brain and Behavior*, Pharmacol Biochem Behav. May 2020, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7183385/

25." *Id*. Mr. Reh has not even reached the age of brain maturation yet. Generally speaking, "adolescent alcohol use has been found to negatively affect cognition, brain structure, and function." *Id*. There are potential negative effects on "memory, learning, visuospatial function, executive function, reading ability and impulsivity." *Id*. Heavy alcohol use is associated with "poorer cognitive functioning on a broad range of neuropsychological assessments, including learning, psychomotor speed, attention, executive functioning, and impulsivity." *Id*.

While Mr. Reh's drinking continued in his adolescence, it began when he was just a child. PSR ¶ 88. It stands to reason that so much alcohol consumption at such a young age and for that length of time have caused him permanent damage. His continued alcohol consumption after he came to the United States is also not an anomaly. It seems that other refugees from his culture have similar struggles with addiction, in part due to the normalization of drinking alcohol in the refugee camps. It becomes so ingrained that they do not even recognize beer or wine as alcohol.[7]

Once Mr. Reh was a teenager and in the United States, he became further addicted to marijuana, methamphetamine, and K2. His substance-abuse problem explains why he "sadly, but predictably, made poor decisions based on impulse and immaturity." *United States v. Hendrickson*, 25 F. Supp. 3d 1166, 1175 (N.D. Iowa 2014).

Prior to being charged in this case, Mr. Reh had never received any treatment and did not have the tools to deal with the adversity in his life. At the time he committed this offense he was

---

[7] Kaela Glass, *Understanding Alcohol Use in the Karen Community* (Center for Urban and Regional Affairs, University of Minnesota 2011), https://conservancy.umn.edu/bitstream/handle/11299/195656/CMV-032.pdf?sequence=1&isAllowed=y

not in his right mind. There are periods of time during the offense conduct that he does not have independent memory of due to his heavy methamphetamine use. Mr. Reh's addiction to K2 during this timeframe also played a part in his poor decision making and may have caused further damage to his brain.[8] Mr. Reh does not offer this an excuse for committing the offense, simply as context regarding his illegal behavior and a plea for rehabilitation.

Mr. Reh has only recently realized the help that treatment can bring through his substance abuse education class at the jail. *See* Ex. B. He found that class so beneficial that he would like to take it again. Mr. Reh is a very young man and can turn his life around if given the tools and the chance to do so. Prior to this he did not know the benefits of treatment and how it could help him. He knows that he would benefit from additional substance-abuse treatment. "[S]uccessful completion of drug treatment combined with new vocational skills would increase his employment possibilities upon release and substantially decrease the likelihood of his recidivism." *United States v. Amaya*, 949 F. Supp. 2d 895, 919 (N.D. Iowa 2013).

***Mental Health.*** Mr. Reh's time in the refugee camp led not just to addiction, but also affected his mental health. Contributing to his decline was the loss of his children, whom he loved, when they were taken from him. Because of his incarceration, they have now been adopted. PSR ¶ 81.

---

[8] Addiction to K2 can result in cravings, negative consequences, compulsive behavior, and a lack of control. *See* Cleveland Clinic, *What Are the Dangers of Synthetic Weed?* (May 2, 2022), https://health.clevelandclinic.org/dangers-of-synthetic-weed. There is also a danger that it can cause irreversible brain damage and memory problems. *See* WhiteSands Treatment, *What Does K2 Do To Your Brain?* (July 3, 2017)*,* https://whitesandstreatment.com/2017/07/03/what-does-k2-do-to-your-brain/.

Both before and during the commission of his offense, Mr. Reh suffered from anxiety, antisocial personality disorder, major depressive disorder, and PTSD. PSR ¶ 86.  At some point he was recommended for "long term therapy," but that never happened. *Id*.  Much like the revelation he had with the substance abuse education class, therapy and potential medication to deal with his mental illness could open up a whole new world for Mr. Reh.

*Criminal History and Immigration Status.*  While Mr. Reh had no juvenile adjudications, he was removed to adult court as a 17-year-old, and eventually was sent to prison for that offense. PSR ¶ 60.  Upon completion of that sentence, he was still held in ICE custody for an additional ten months awaiting removal.  When it was ultimately determined he would not get travel documents, he was finally released.  Mr. Reh returned to his parents' home, and he was changed from his incarceration.  It was a difficult transition.  During his time in prison, he had been abandoned by all of his friends, he was functionally illiterate, and he returned to the only coping mechanism he knew – drugs and alcohol.  He withdrew to his room and the internet, which is where he met MV #1, who was also Karenni.  Mr. Reh committed a crime, and he is not disputing that, but he did not fully understand the gravity and the consequences of the offense that he committed at the time he was committing it.

*Impact of Guilty Plea***.**  Mr. Reh's acceptance of responsibility and sincere remorse for his actions evidences his "respect for the law," and the deterrence already in action within him.  This, in turn, suggests that a sentence even lengthier than the ten-year mandatory minimum is unnecessary to protect the public.  Mr. Reh has completely accepted responsibility in this case and pled guilty despite knowing the applicable guidelines would likely recommend a sentence longer than he has been alive.  Mr. Reh admitted to his illegal conduct and does not dispute the

9

facts in the PSR.  While Mr. Reh did possess firearms, there is no evidence he used them to intimidate or threaten the victim.  Mr. Reh has had no violations in custody and has been attending the classes that he can understand and is working on reading every day.

Notwithstanding the severe penalties he was facing, Mr. Reh pled guilty, allowing the Court and the government to avoid preparing for trial and permitting better allocation of their resources.  While the guidelines account for his acceptance of responsibility with a three-level reduction under USSG § 3E1.1, the Court should consider Mr. Reh's acceptance of responsibility as warranting a greater reduction and vary downward further in light of the nature of this case.  Mr. Reh's decision to plead guilty prevented the victim and her family from having to endure sitting through additional witness interviews and preparation with the government and its agents, having the facts of this case aired publicly to a jury, taking time from their lives to litigate the past, and otherwise enduring the turmoil that accompanies a trial.  In a case like this with a teenage victim, the impact of Mr. Reh's decision to pled guilty should not be understated.

**Support System.**  At the outset of this case, Mr. Reh was terrified and convinced that his family would abandon him because of the choices he has made.  Mr. Reh anticipated they would feel as disgusted with him as he felt with himself.  But instead, his family have continued to support him as much as they can.  His mother's letter details the difficulties the family has had without him. *See* Ex. A.

A lengthy term of imprisonment will deteriorate Mr. Reh's familial relationships— "Because prisons are often located in rural areas, and because convicts' families and friends have limited ability to travel, convicts' relationships with people on the outside—the people most likely to motivate convicts to lead straight lives—may be eroded seriously during long terms of

10

imprisonment." *United States v. Bannister*, 786 F. Supp. 2d 617, 659 (E.D.N.Y. 2011).  The Court should take into account these collateral consequences of incarceration when deciding on an appropriate sentence in this case.

      Sentencing Mr. Reh to 30 years in prison is essentially throwing him away.  He has already endured an extremely difficult life.  Mr. Reh does not need 30 years in prison to change his behaviour.  That is too much time to punish him.  That amount of time is not necessary to show him that his actions were wrong.  He will continue to suffer under the label as a sex offender in prison, and for the rest of his life if he makes it through his prison term.  Even the Bureau of Prisons "recognizes sex offenders as a vulnerable population within a prison setting."[9]  Mr. Reh is terrified of how sex offenders are treated by both other inmates and the staff in prison.  It is common knowledge that life is a lot more difficult for sex offenders in prison.  Mr. Reh is nervous and sick about what will happen to him in there.  The only glimmer of hope he has is a sentence closer to the mandatory minimum.  Even ten years is a punitive, lengthy prison sentence.  But a sentence closer to that length can also be rehabilitative.  Mr. Reh wants to get all the schooling and classes that he can.  He wants to learn, and have a job, and be productive in life.  He would like to learn a trade in construction and carpentry.  Mr. Reh is requesting placement in Minnesota or Wisconsin to be as close to family as possible.

      A guideline sentence lessens the chance of any future rehabilitation and guarantees Mr. Reh will become institutionalized.  A sentence of 30 years would mean that prison would be the only life Mr. Reh would know.  With a sentence that long, it is likely that none of his family would be around when he is finally released.

---

[9] https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp

*Post-Incarceration Supervision.* Finally, in deciding on the length of Mr. Reh's prison term, the Court should also consider that he must also serve at least a five-year term of supervised release. For someone of Mr. Reh's background and age, a shorter prison sentence and a longer term of supervised release best fits the goals of sentencing. Rehabilitation, both for addiction and mental illness, is best done and most effective in the community. The supervised release conditions for sex offenders are particularly stringent.[10] Mr. Reh will likewise be required to register as a sex offender. If he violates the conditions of supervision, the Court could send him back to prison. Mr. Reh is simply asking for an opportunity to return to society and show rehabilitation can work.

## III.    CONCLUSION

For the foregoing reasons, the Court should vary downward and impose a sentence well below the guideline range, which can be followed by a lengthy term of supervised release. Such a sentence would be sufficient, but not greater than necessary, to address the factors set forth in 18 U.S.C. § 3553(a).

Respectfully Submitted,

 /s/ Melanie S. Keiper
Melanie S. Keiper, Asst. Federal Defender
FEDERAL PUBLIC DEFENDER'S OFFICE
400 Locust Street, Suite 340
Des Moines, Iowa 50309-2353
PHONE: (515) 309-9610
FAX: (515) 309-9625
E-MAIL: melanie_keiper@fd.org
ATTORNEY FOR DEFENDANT

---

[10] *See, e.g.*, PSR ¶¶ 134–142.

CERTIFICATE OF SERVICE

    I hereby certify that on April 8, 2024, I electronically filed this document with the Clerk of Court using the ECF system, which will serve it on the appropriate parties.

                                                      */s/ Morgan Conn*, Paralegal